Gerald Francis BRENNAN, Petitioner,

v.

W. D. BLANKENSHIP, Superintendent of the Bland Correctional Center and Marshall Coleman, Attorney General, Commonwealth of Virginia, Respondents.

Civ. A. No. 78–0037(R).

United States District Court,
W. D. Virginia.

Feb. 23, 1979.

**150**

Jeffrey Krasnow, Roanoke, Va., for petitioner.

Robert Herring, Asst. Atty. Gen., Richmond, Va., for respondents.

## OPINION

TURK, Chief Judge.

Gerald Francis Brennan seeks habeas corpus relief under 28 U.S.C. §§ 2241 and 2254. Petitioner was convicted of two counts of malicious wounding in the Circuit Court for the County of Montgomery. He was sentenced to two thirteen year terms of imprisonment, to run consecutively. He now contends that these convictions are constitutionally infirm because of ineffective assistance of counsel. Brennan has previously asserted the identical claim in a habeas proceeding conducted in the Montgomery County Circuit Court. His petition was denied and this ruling was upheld on appeal to the Virginia Supreme Court. All parties acknowledge that full exhaustion of the Sixth Amendment claim has occurred. See 28 U.S.C. § 2254(b) and (c). Consequently, the court proceeds to consideration of petitioner's claim on its merits.

## FACTUAL BACKGROUND

Stated briefly, petitioner contends that defense counsel failed to properly investigate and communicate the possibility of a defense of insanity. Brennan was charged with the malicious wounding of George B. Hall and George B. Hall, Jr. The Hall family were neighbors of the Brennans. The relationship of the two families had been harmonious until early 1973 when a dispute arose over an access road utilized by Hall, Sr. which crossed land owned by Brennan's wife. On April 9, 1973, Brennan received a letter from the Halls' attorney offering to buy the property in question and threatening legal action if the sale was not effected. Brennan mulled over the letter, consulted with his attorney, and did some chores. Sometime thereafter, Brennan returned to his home, reread the letter, and fell into a rage. He armed himself with two revolvers and a substantial quantity of ammunition. He then got into his vehicle and proceeded to drive down his private driveway to the state highway.

Upon reaching the highway, Brennan spotted a vehicle driven by Hall, Sr. and occupied by Hall, Jr. Brennan proceeded to ram the Hall vehicle off the road. Petitioner then exited his car and shot Hall, Sr. five times and Hall, Jr. four times. Brennan then returned to his home where he called the County Sheriff to report the incident. Brennan was arrested and taken to jail. He called his family attorney, Bentley Hite. Hite agreed to represent Brennan though Brennan and Hite later determined to hire J. L. Dillow, Esq. as co-counsel.

On April 10, 1973, Hite and Brennan appeared in General District Court for preliminary proceedings. Brennan was sent to Southwestern State Hospital in Marion for an evaluation of his mental capacity. A report was issued by a Dr. Zygmunt Wegielski of that hospital on May 18, 1973, stating that Brennan had not been found to be psychotic, and that he was competent to stand trial. Upon his return from Southwestern State, petitioner was released on bond. His attorneys arranged for him to be examined by two more psychiatrists. The first, a Dr. Hurt, concluded that Brennan was mentally competent. The second, a Dr. Morgan Scott, conducted a preliminary examination and admitted petitioner to St. Albans Hospital in Radford on November 23, 1973. Brennan had been scheduled to be tried on December 7, 1973. His attorneys later admitted that they had not been prepared for trial on that day. Instead,

they appeared before Circuit Court Judge Southall Jordan and moved for a continuance on the ground that Brennan was mentally incompetent to assist in his own defense. In support of the motion, Hite and Dillow presented the testimony of Dr. Scott. Dr. Scott noted that Brennan was not competent to assist in a defense. More importantly, Dr. Scott opined that Brennan was psychotic on the day of the shooting and was not aware of what he was doing. Dr. Scott related that Brennan's controlled paranoid schizophrenic condition could become manifest under stress. Accordingly, the doctor opined that Brennan might provide further danger to the Halls if he were to remain free on bond. Judge Jordan granted the continuance, suspended the bond, and ordered Brennan confined in the maximum security area at St. Albans under the care of Dr. Scott.

Thereafter, a belabored and often heated series of letters and communications were exchanged between Mr. and Mrs. Brennan and the two defense counsel. Brennan soon became dissatisfied with the restrictions imposed at St. Albans and sought transfer to another facility. At Brennan's behest, Attorney Dillow arranged for the petitioner to be returned to Southwestern State. As evidenced by a letter from Dillow to Mrs. Brennan dated January 9, 1974, petitioner had apparently expressed some reservations as to the treatment at St. Albans and his interaction with Dr. Scott.[1] Dillow's response was to the effect that Dr. Scott is a highly competent and respected professional. In a follow-up letter to Dillow dated January 11, 1974, Brennan related that his primary concern was not for Dr. Scott's competence but rather for the fact that Dr. Scott insisted that he (Brennan) remain in maximum security. At that point, Brennan also expressed some question as to the sufficiency of the efforts of Attorney Hite. As regarded the question of alternate trial strategies, Brennan communicated his desire to avoid any approach which might lead to a determination of continuing insanity. However, he clearly indicated that he

wished to pursue any advantage that might be obtained from a determination of temporary insanity. Finally, in the letter of January 11, 1974, Brennan indicated that he wished to secure release on bond.

In a letter to Brennan dated January 30, 1974, Attorney Dillow indicated that he was investigating the extenuating circumstances of the case for the purpose of possibly establishing that petitioner was "in such condition at the time of the alleged offenses that [petitioner was] incapable of realizing the consequences of [his] acts and maybe thereby remove malice from the case." At least at that time, Dillow made no further mention of the possibility of interposing a legal defense of insanity. Dillow suggested further medical evaluation in an effort to "overcome the inference of malice." Dillow also discussed the question of Attorney Hite's continuing participation in the defense. Brennan also wrote Dillow on January 30, 1974 and indicated that he wished Hite to continue in the case. Brennan related that doctors at Southwestern State had told him a finding of not guilty by insanity might result in incarceration at a mental facility for many years. Brennan requested information on the possibility of pleading guilty to a charge of "wounding without malicious intent." Dillow responded by letter of February 8, 1974. While Dillow discussed the upcoming trial date of April 9, he did not undertake to mention the possibility or legal ramifications of a plea of insanity. Brennan continued to press for a release on bond pending trial. In this regard, Brennan noted in a letter to Dillow dated February 12, 1974 that the reports of the doctors at Southwestern State might prove favorable. Recognizing that such an attempt might cause the credibility of Dr. Scott's earlier testimony to be questioned, Brennan suggested that Dillow consult with the doctor. He specifically stated that "[b]efore I shut the door on Dr. Scott, however, I do not want to hamper or hinder your efforts." Brennan did relate that he wanted to seek release on bail,

---

1. This letter and all other letters described herein are entered as exhibits to either the federal habeas record or the state habeas record.

sparing no legal avenue. In a letter to Dillow dated February 22, 1974, Brennan complained of the lawyer's inactivity on the bail motion.

On February 27, 1974, Dillow and Hite appeared before Circuit Judge Jordan seeking Brennan's release on bond. Dillow submitted a letter from Dr. Wegielski from Southwestern State in which the doctor stated that the chances were "slim" that Brennan would prove dangerous if released. After the prosecution restated Dr. Scott's earlier findings, Judge Jordan denied the bond request, noting that defendant should not be allowed to rely on different doctors' reports in order to serve different tactical purposes. Judge Jordan ordered Brennan returned to St. Albans for further examination by Dr. Scott whose opinion, the judge said, would serve as dispositive of the bond question. Dillow reported the results of the hearing to Brennan by letter dated March 4, 1974. Dillow also noted that he and Judge Jordan had "worked out the plan" whereby Brennan was to be brought to the Montgomery County Jail rather than St. Albans, still with the expectation of examination by Dr. Scott. On March 26, 1974, Brennan sent Dillow an eighteen page autobiography which was apparently intended to assist counsel in the development of a defense and/or evidence in mitigation. At the end of his self-analysis, Brennan wrote as follows:

"Considering the above record, it seems incredible that Jerry Brennan could have been involved in a conflict that would result in a shooting. Those who sit in judgment of this man must search their minds and hearts to answer the question: Why did this tragedy occur? . . .

"I, Jerry Brennan, confided some of my troubles to my wife and friends, but I was nevertheless approaching a nervous breakdown brought on primarily by the conditions I encountered on returning from Guam on July 1, 1972, . . . I was simply unable to cope with the repudiation of friendship displayed by George Hall . . . ..

"In retrospect I can see now that I simply permitted these antagonisms to eat me alive, to destroy my sense of balance. I found myself in a situation which appeared to have no logical or final solution. In a world which for several years now has seemed falling apart, with a breakdown of our traditional values and standards, I was a casualty of that breakdown myself. In attempting to resolve my problem I acted irrationally. In a moment of rage, life was suddenly meaningless and I was prepared to sacrifice myself for principle."

On March 28, 1974, Dillow again wrote Brennan. No mention was made of securing further opinion from Dr. Scott and, indeed, no supplemental examination occurred prior to trial. Instead, Dillow recommended that the shootings of the father and son be severed for purposes of trial. Dillow also discussed trial tactics such as strict jury panel scrutiny, character witnesses, pros and cons of Brennan testifying, change of venue, and rebuttal of an inference of malice. No mention was made of an insanity plea. Dillow related that his opinions as to case presentation would give way to any better opinions expressed by Brennan or Hite. Dillow sent additional letters on April 2 and 3. The attorney related that he was having difficulty locating character witnesses. Dillow summarized the possible jury verdicts. He related that he could discern no defense that a jury would likely accept. While he stated that he understood that Brennan was upset on the day of the shooting, Dillow opined that it would be difficult if not impossible to convince a jury that Brennan was guilty of anything less than malicious wounding. Dillow suggested plea bargaining.

Brennan was tried on April 8 and 9 on charges of malicious wounding of George Hall, Sr. No evidence of insanity was offered. The defense consisted of Brennan's testimony, and that of his wife, daughter, and six character witnesses. In closing arguments for the defendant, Attorney Hite argued that at the time of the shooting, Brennan "lost his temper completely, became irrational, and did something that none of us would do if we were in our right

mind." He also suggested to the jury that Brennan had been "beside himself" and that "he didn't know what he was doing at times." However, the court gave an instruction to the effect that since insanity had not been raised as a defense, there existed an unrebutted presumption of sanity and legal responsibility for acts done. The instruction was given over objection of the defense. The jury found Brennan guilty of malicious wounding and sentenced defendant to thirteen years incarceration.

A series of letters were thereafter exchanged between Dillow and Brennan regarding strategy for the trial on malicious wounding of Hall, Jr. On June 5, 1974, Brennan wrote Dillow that since the evidence in the first trial suggested that the victims suffered powder burns and since he [Brennan] could not remember firing at less than ten feet, "I would be forced to conclude that a brief period of irrationality did exist, and therefore possibly a plea of temporary insanity should be considered." He further stated that "I want the truth to come out, whatever it may be or wherever it may lead." Brennan also indicated a desire to appeal his first conviction. While defense counsel had sketched out a rough draft of a petition of appeal, no appeal was ever perfected. On June 22, 1974, Mrs. Brennan wrote a critical letter to Dillow questioning the efforts of defense counsel. One of her specific questions concerned the possibility of obtaining further medical and psychiatric evaluations, "either to confirm or to question Dr. Scott's sworn testimony."

The second trial was scheduled for July 26, 1974. Eventually, a bargain was reached whereby Brennan would plead guilty to malicious wounding of Hall, Jr. in exchange for a recommendation of a second thirteen year sentence to run consecutively with the first. On the day set for trial, Brennan so pled, admitting that the plea was made freely, voluntarily, without pressure, and with full understanding of the ramifications. He stated that he was satisfied with the representation of Hite and Dillow. Sentence was rendered consistent with the agreement.

An interesting series of events occurred in mid 1976 which shed further light on the factual controversy in the instant matter. The Halls made known their intent to claim civil damages arising out of the shooting episode. Brennan's homeowners insurance carrier attempted to secure a declaratory judgment to the effect that it could not be held responsible for any damage award since damages arising out of intentional acts were expressly excluded from the policy's liability coverage. The crux of the insurance carrier's argument was that the adjudication of the questions of Brennan's sanity were barred under the doctrine of *res judicata,* given the outcome of the criminal proceedings. The matter was heard by Circuit Judge Jordan who had presided in both criminal proceedings. The Halls were represented by the same attorney who had served as special prosecutor in the criminal proceedings. The Halls argued that Brennan had been at least temporarily incapacitated at the time of the shootings and that his acts could not be deemed to have been intentional. In an agreed statement of the facts adduced at an evidentiary hearing, Dr. Morgan Scott was said to have testified as described in the following statement:

"In his testimony . . . Dr. Scott testified that in his medical opinion Brennan was a latent schizophrenic and that the letter from the attorney of . . . Hall, Sr., had activated this schizophrenia to the point to which Brennan was unable to control himself and could not realize the consequences of his act. He furthermore testified that in his opinion Brennan was not mentally competent at the time of the shooting. Counsel for the [Halls] asked the doctor whether he thought that Brennan had the mental capacity at the time of the shooting to foresee its consequences. Dr. Scott in response to this question replied that it was his opinion that Brennan did not have such mental capacity. However, Dr. Scott also testified that his examination of the Defendant Brennan took place some time after the assaults upon the [Halls]."

In a short order and decree, Judge Jordan ruled that the insurance carrier was respon-

sible for any civil damages to which the Halls might be found entitled.[2]

Dr. Morgan Scott also testified at a hearing conducted by the Montgomery County Circuit Court on Brennan's petition for state habeas relief. At that hearing, Dr. Scott restated his previously described diagnosis. The doctor further testified that in his opinion, Brennan, on the day of the shootings, did not realize the consequences of his actions, did not know that his actions were wrong, did not have the capacity to distinguish between right and wrong, and did not possess a will sufficient to restrain the impulse that arose. Dr. Scott also stated that after testifying on December 7, 1973, he had prepared to testify at trial but was never again contacted by either Dillow or Hite. The state habeas proceedings eventually resulted in a denial of relief. Throughout the state habeas proceedings and in hearings conducted before this court, Attorneys Dillow and Hite maintained that they felt that there was insufficient evidence for a viable insanity defense and, even had such evidence been available, they abandoned such a tactic given their perception of Brennan's adamant protestations against any strategy which might have led to a prolonged mental commitment and stigma.

## APPLICABLE LEGAL STANDARDS

There is only one major issue involved in this case: whether petitioner's attorneys afforded him ineffective assistance through their failure to more fully investigate and/or develop a defense of insanity to the charges of malicious wounding. More specifically, it must be determined whether petitioner's defense was constitutionally prejudiced through the failure of his attorneys to follow-up on any possible advantage that might have been obtained by further participation of Dr. Scott in petitioner's case.

■ There is a second, threshold issue which is of little moment and need not long detain the court. The state habeas proceed-

ings resulted in a finding of constitutionally acceptable assistance of counsel. Normally, such a factual determination after a hearing on the merits will not be disturbed, in the absence of special circumstances, unless a petitioner establishes by convincing evidence that the state determination was erroneous. 28 U.S.C. § 2254(d). However, this rule does not bar a reassessment of factual issues when the state court utilized an improper legal standard in making its factual determination, even where the proper legal standard had not yet been announced at the time of the state court's findings. *U. S. ex rel. Williams v. LaVallee,* 487 F.2d 1006 (2nd Cir., 1973), *cert. den.* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). In the instant case, the state habeas court rendered its decision on May 18, 1977. The court measured the effectiveness of the assistance of counsel under the "farce and mockery" standard of *Hoffler v. Peyton,* 207 Va. 302, 149 S.E.2d 893 (1966). This test was specifically rejected by the United States Court of Appeals for the Fourth Circuit on September 2, 1977 in *Marzullo v. Maryland,* 561 F.2d 540 (4th Cir., 1977), *cert. den.* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978). *Marzullo* requires representation by an attorney in a specific case to be measured against the level of competence generally demanded of attorneys in criminal cases.

■ It has been suggested that the standards of *Marzullo* should not be applied retroactively. However, while the court is unaware of any decision specifically holding *Marzullo* to be retroactive, the "normal level of competence" test has been applied by the Fourth Circuit in numerous cases involving representation afforded by defense attorneys prior to the announcement of *Marzullo. Fuller v. Luther,* 575 F.2d 1098, 1101 (4th Cir., 1978), *Proffitt v. U. S.,* 582 F.2d 854 (4th Cir., 1978), reh. and reh. en banc den.; *Springer v. Collins,* 586 F.2d 329 (4th Cir., 1978). Indeed, *Marzullo* borrowed heavily from *McMann v. Richardson,* 397

---

2. The relevant documents from the civil proceeding are entered as exhibits in the federal habeas record. Judge Jordan's decision was appealed to the Virginia Supreme Court.

U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) and was obviously foreshadowed by *Coles v. Peyton,* 389 F.2d 224 (4th Cir., 1968). See *Marzullo, supra* at 543. The court is of the opinion that the *Marzullo* standard must be applied in the instant case. In attempting to make the relevant evaluation, the court may determine the "normal level of competence" by reference to such sources as case precedent, state bar canons, American Bar Association Standards Relating to the Defense Function, and, in some instances, expert testimony. *Marzullo, supra* at 544. The court proceeds with the understanding that it is not enough that defense counsel may have committed error or made a poor choice among several strategical alternatives. Rather, a petitioner must generally establish "that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation." *Marzullo, supra* at 544. See also *Springer v. Collins, supra* at 332.

## RESOLUTION OF THE INSTANT CASE

This court need not and cannot determine whether Gerald Brennan would have prevailed on pleas of insanity.[3] The court need only determine that petitioner received totally ineffective assistance through the failure of defense counsel to fully investigate and affirmatively communicate the possibility and impact of raising such pleas. There can be no doubt that Dr. Scott's opinions were highly relevant. Dillow and Hite knew what his opinions were. The attorneys knew that the presiding judge considered Dr. Scott's opinions to be significant. As to the decision regarding Brennan's pre-trial release on bond, Judge Jordan, in effect, told the attorneys that Dr. Scott's opinions, after further examination, would be considered dispositive. Despite Judge Jordan's direction, Dr. Scott testified that he was never again contacted after December 7, 1973 regarding further exami-

nation of petitioner. In the rather bizarre turn of events surrounding the subsequent civil proceedings in 1976, Dr. Scott was called upon to offer testimony in which he described Brennan as not responsible mentally for the shooting incident. Dr. Scott's testimony led to Judge Jordan's civil decree to the effect that Brennan's actions were not intentional. Yet, that some testimony was available to defense counsel for purposes of the criminal proceedings had counsel merely undertaken to pursue what could be seen, even at that time, as the only coherent and viable response to the criminal charges.

In short, there is simply no basis for respondents' contention that there was no evidence upon which a plea of insanity could have been premised. Notwithstanding Dr. Scott's availability and diagnosis, Brennan's aforementioned communications to Dillow, especially that of March 26, 1974, should have been sufficient to alert any trained attorney as to the possibility of an insanity defense. When it appears to defense counsel that psychiatric assistance is needed to prepare his client's defense, counsel is under a duty to seek it. *Proffitt v. U. S.,* 582 F.2d 854, 857 (4th Cir., 1978). When proof of the uncertainty of his client's mental condition is known to defense counsel, his failure to adduce it in court renders his representation "ineffective to the point of depriving him of his Constitutional right to counsel." *Owsley v. Peyton,* 368 F.2d 1002, 1003 (4th Cir., 1966). See also *Proffitt v. U. S., supra* at 857. While the attorneys attempted at closing arguments in the first trial to inject their own perceptions of Brennan's mental state, they had adduced no evidence in support thereof. It is not remarkable that the trial judge instructed the jury as to presumed legal responsibility for one's actions. He had been left no other alternative.

---

**3.** There is no doubt that, under Virginia law, a defendant competent to stand trial may still raise an insanity defense as to past criminal acts. See, Gen., 10A Michie's Jurisprudence Virginia and West Virginia §§ 43–44 (Repl.Vol. 1977). Virginia employs the M'Naghten "right and wrong" test of insanity. See *Thornhill v. Peyton,* 285 F.Supp. 104 (W.D.Va., 1968).

It is no answer for respondents to now assert that Brennan conclusively rejected an insanity defense. Indeed, as to the charge of malicious wounding of Hall, Jr., the record conclusively establishes that he did not rule out such a possibility. More importantly, in such circumstances, it can scarcely be said that defense counsel discharged their professional responsibility by allowing their case to be guided simply by the uninformed wish of their client to avoid a long period of mental commitment. Dr. Scott had told anyone who bothered to ask him that Brennan suffered from latent schizophrenia which was aggravated by stress. Incarceration in a mental hospital pending trial on serious criminal charges could only be perceived as a stressful situation. Under any professional standard, it is improper for counsel to blindly rely on the statement of a criminal client whose reasoning abilities are highly suspect. This circumstance becomes even more cogent when it is realized that when Brennan communicated his desire to avoid a long period of mental commitment, he was acting under impressions received from talking with the staff at Southwestern State and not from his attorneys. There is no indication that Brennan ever understood that the length of commitment after a judgment of acquittal by reason of insanity would be contingent on whether the impairment was transitory and/or remediable. In short, there is no suggestion that defense counsel discussed the impact of the Virginia "safe and sane" statute with the defendant.[4] Given the attorneys' reasonable conclusion that there was no other factual defense or factors in mitigation, it is almost incredible that the attorneys did not press Brennan on the point. While Brennan and the attorneys may have discussed the matter verbally, it is incredible to believe that an informed discussion took place given the total absence of discussion of the applicable law in the voluminous correspondence exchanged prior to trial. Given his admission of mental breakdown and irrationality as evidenced by his letter of March 26, 1974, it is incredible to believe that Brennan intelligently insisted that the "stigma" to be attached to a possible finding of temporary insanity was so significant as to conclusively preclude an insanity defense. In so far as such a consideration is relevant, this court can only conclude that Brennan expected his attorneys to be bound only to the extent of the mandate of Brennan's letter of January 30, 1974: to "ultimately develop the best defense available to me."

Under the applicable professional standards, Brennan had every right to expect that this mandate would be fulfilled. The American Bar Association Standards Relating to the Defense Function (tent. draft, 1970) provides in pertinent part as follows:

5.1 Advising the defendant

(a) After informing himself fully on the facts and the law, the lawyer should advise the accused with complete candor concerning all aspects of the case, including his candid estimate of the probable outcome.

(b) It is unprofessional conduct for a lawyer intentionally to understate or overstate the risks, hazards or prospects of the case to exert undue influence on the accused's decision as to his plea. . . .

In its comments to this provision, the ABA Advisory Committee stated, at 235, as follows:

*If the defendant is mentally competent,* the decision as to what plea to make belongs ultimately to him; . . . The decision to plead guilty can be an intelli-

---

4. At the time of Brennan's trial, the Code of Virginia (1950), § 19.1–239 (now § 19.2–181) provided that a defendant acquitted by reason of insanity or feeblemindedness must be examined by three psychiatric experts to determine his sanity and whether his release would be dangerous to himself or to the public. The findings are reported to the court. Unless the court is satisfied that the acquitted person is both sane and no danger to himself or society, he must be committed. The commitment is not indefinite, however, since the committed individual is entitled to a periodic review of the "safe and sane" determination. See, gen., Note, The Virginia Procedure for Commitment and Release of Persons Acquitted by Reason of Insanity, 11 William and Mary Law Review 185 (1969).

gent one only if the defendant has been advised fully as to his rights and as to the probable outcome of his alternative choices. *Kercheval v. United States,* 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). (Emphasis added).

While this court does not adopt the argument that defense counsel had an affirmative duty to enter pleas of insanity notwithstanding defendant's wishes, it is clear that a professional duty was breached through the total failure of defense counsel to develop the potential of Dr. Scott's testimony. Moreover, the extensive written communications between counsel and Brennan strongly suggest that the possibility and ramifications of an insanity defense were not actually discussed. Even if the court was to credit the testimony of counsel to the effect that such verbal discussions did take place, the record establishes that the advice provided by counsel was woefully inadequate. In his letter of January 30, 1974, written the day after a prolonged meeting with Dillow, Brennan stated that the doctors at Marion "were amazed when I related last night you said you had never heard of the 'safe and sane' law." After attempting to cite the "safe and sane" provision for Dillow's benefit, Brennan asked "[d]oes this in any way alter your view concerning my plea?" If Brennan did urge against an insanity plea, he did so without an understanding of the applicable law. The situation would not have occurred had defense counsel discharged their professional responsibility.

Even if defense counsel had any reason to believe that Brennan rejected insanity pleas despite their advice, counsel still responded improperly. In pertinent part, the ABA Standards Relating to the Defense Function provide as follows:

5.2 Control and Direction of the case.

. . . . .

(c) If a disagreement on significant matters of tactics or strategy arises between the lawyer and his client, the lawyer should make a record of the circumstances, his advice and reasons, and the conclusion reached. . . .

The appropriate commentary to the sub-section goes on to explain that such records may assist in the disposition of post-conviction proceedings and may consist of a letter from the attorney to the client. Given the total absence of such record in this case, and for other reasons stated above, the court must conclude that petitioner did not receive any meaningful advice or information concerning the possibility and ramifications of the legal defense of insanity.

As to the remaining index of the "general level of competence" as described in *Marzullo,* the court notes that Robert Ryder, Esq. testified at the federal habeas hearing as an expert witness. Ryder is currently the Commonwealth's Attorney for the City of Roanoke and possesses much experience in criminal matters. Ryder opined that diligent and competent counsel would have attempted to further develop the potential of Dr. Scott's testimony. Even if an insanity defense was rejected, such development must be viewed as having been essential to an informed and meaningful consultation between attorney and client.

## SUMMARY AND DISPOSITION

This is not a case such as *Springer v. Collins, supra* in which the possibility of an insanity defense was not known to defense counsel. All trial participants were aware, or should have been aware, of the significance of Dr. Scott's viewpoints. Nor is this a case, such as *Springer,* in which the opinion of the medical experts could not have influenced the outcome of the criminal proceedings. Finally, this is not the typical ineffective assistance case in which the decision to adopt one of several possible trial strategies can be seen in retrospect to have been ill-advised. As consistently communicated to Brennan by Dillow, there were absolutely no other viable defenses and few, if any, factors in mitigation.

This is a case in which counsel totally failed to develop the only conceivable defense. It is a case in which defense counsel failed to properly advise their client as to his legal alternatives and then allowed themselves to be blindly guided by his uninformed direction. Brennan himself was not

blameless. He and his wife consistently berated the attorneys they had hired. In insisting that he be removed from St. Albans Hospital prior to trial, Brennan placed his momentary personal convenience over what he had been told were his own best interests. Brennan's letter of March 26, 1974 is phrased more as his attorneys' closing argument than as a tool for the joint formulation of a defense. In response, defense counsel did not engage in a negligent disregard of their client's interest. Dillow answered every letter. He contacted numerous character witnesses. Perhaps predictably, counsel bent over backwards to insure that Brennan's demands for custodial comfort and convenience were met. However, as regards the measure of their professional performance under the standards to which this court is bound, it must be concluded that counsel bent too far. While a client may prove obstinate, it is still the responsibility of defense counsel to pursue all avenues leading to that client's best interests.

The court has found that the failure of defense counsel to pursue the possible tactical advantage provided by Dr. Scott's testimony constituted a professional omission of crucial magnitude. The court has found that defense counsel failed to inform petitioner that the legal defense of insanity was the only potentially successful alternative to be pursued. The court has found that defense counsel failed to inform petitioner of the legal ramifications of a successful insanity plea. The court has found that defense counsel allowed themselves to be guided by petitioner's aversion to such a plea when in fact such aversion arose in part from a lack of information which should have been supplied by counsel. Under any and all standards of professional competence known to this court, the court must conclude that the representation provided petitioner in this case fell far below the level of competence normally demanded of attorneys in like situations. It follows that since petitioner has been deprived of effective assistance of counsel as guaranteed under the Sixth and Fourteenth Amendments, the writ of habeas corpus must issue.